Submitted on accused's brief and the
record September 18, complaint dismissed October 23, 1979

In re. Complaint as to the Conduct of
## WILLIAM B. MURRAY,
*Accused.*

(OSB 1340, SC 26336)

601 P2d 780

PER CURIAM.

## PER CURIAM

The Oregon State Bar charged William B. Murray with violating several standards of professional responsibility in one transaction. A trial board, ORS 9.525, and the Disciplinary Review Board, ORS 9.535, found the accused guilty of only one violation, that he initiated a communication by his client with another party to a controversy without notifying or obtaining the consent of that party's counsel.[1] The matter was submitted to this court on the record and on the accused's brief without oral argument or response by the bar.

The transaction that gave rise to the charges concerned an effort to transfer ownership of a mine by means of a mortgage foreclosure and to clear the title of wage liens against the mine. The need to do so arose from earlier transactions among a number of individuals and corporations in Arizona and Oregon which were traced in detail in the findings of the trial board. The facts themselves are essentially undisputed. A

---

[1] Disciplinary Rule 7-104 provides:

"(A) During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

"(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client."

The trial board and the Disciplinary Review Board also cited Oregon State Bar Rule 11. However, when this court pursuant to ORS 9.490 adopted the Code of Professional Responsibility on December 30, 1970, the court did so "in lieu of and instead of and replacing the Rules of Professional Conduct which heretofore governed the professional conduct of the members of the Oregon State Bar." Order completing and perfecting the record of the approval and adoption of the Code of Professional Responsibility, Supreme Court Journal, vol. 40, August 11, 1971.

brief summary here suffices for the disposition of this proceeding.

A client of Murray's, Gaither, sold the Oregon King Mine to Dax Corporation, receiving a purchase money mortgage from Dax. He later sold this mortgage to Mr. and Mrs. Ron Gamble, residents of Arizona. Dax Corporation entered a joint venture to rehabilitate the mine with Silver Productions, Inc., whose president was another Arizona resident, Felix Seidel. Felix Seidel eventually sold his equity in Silver Productions, Inc., to Dax Corporation and received a second mortgage on the Oregon King Mine.

Felix Seidel's son Stephen, who resided with his father in Arizona, was employed to work at the mine by Silver Productions, Inc. After the sale to Dax Corporation, Dax assumed responsibility for his wages and expenses. When Dax failed to pay Stephen, he retained Gordon W. Stewart of Madras, Oregon, to collect his wage claim from Dax and Silver Productions, Inc. Stewart filed a mining labor lien on Stephen's behalf in May, 1975, and in July filed a complaint to foreclose the lien against both corporations and all other parties that might have adverse interests in the mine. Murray represented the Gambles, Gaither, and himself in connection with Stephen's suit.[2]

In August, 1975, Ron Gamble and Felix Seidel consulted Murray in Portland concerning a plan to obtain ownership of the mine by means of foreclosing the Gambles' mortgage. They wished to do so rapidly in order to take advantage of a financing opportunity then available to Felix Seidel. Seidel planned to settle the outstanding wage claims of his son and another employee. Murray advised Seidel and Gamble that the foreclosure could be facilitated if the several defendant parties signed waivers to the effect that they did not intend to contest the foreclosure. Murray said that he would prepare appropriate documents and mail

_____

[2] Gaither and Murray had certain royalty interests in the mine.

them to Gamble, but he pointed out that each of the named parties would have to consult counsel before actually signing the waiver.

In September, 1975, Murray sent to Gamble a mortgage foreclosure complaint for verification, along with waiver forms to be signed by Dax Corporation, Silver Productions, Inc., Felix Seidel and Stephen Seidel, if each of them were willing to waive contest of the foreclosure of Gambles' mortgage. Murray did not send a copy of the Gamble complaint or the waiver form to Stephen's Oregon lawyer, Stewart. He did not expect Stewart to represent Stephen in this connection, because Felix Seidel had said that he would settle Stephen's wage claim and lien before the mortgage foreclosure would be filed. It is this failure to communicate with Stewart that is the gravamen of the present complaint.

As it turned out, events developed somewhat differently from Murray's expectations. Felix Seidel took the waiver forms to his Arizona counsel, and upon discussion by telephone with Murray, it was agreed that the idea of proceeding by waivers should be abandoned. The Gambles' mortgage foreclosure complaint was filed in Jefferson County on October 1, 1975, and served on the named defendants.

In January, 1976, however, Mr. Stewart in Madras took an order of default on behalf of Stephen Seidel against his father, Felix. This was done against Stephen's instructions to sue only Dax and Silver Productions, Inc., and to the annoyance of both Seidels. Eventually, upon Stephen's further direction, the default was set aside and Stewart withdrew from representing Stephen in his wage lien foreclosure suit. Meanwhile, Felix Seidel had told Stephen of the existence of the unused waiver forms in Seidel's Arizona counsel's file, and Stephen signed the waiver as well as a newly prepared release in order to release his father from liability for his wage claim. This was the waiver form that had been sent by Murray to Gamble as part

of the expedited foreclosure plan which was later abandoned.

The transfer of ownership of the mine was ultimately accomplished by pursuing the foreclosure of the Gamble mortgage to judgment. Remaining after these legal transactions is the present complaint against Murray for having sent Gamble a form on which Stephen Seidel could waive his claim without obtaining the consent of Stephen's Oregon counsel, Stewart.

In defense, Murray argues that he never communicated with Stephen Seidel either directly or indirectly through anyone else, nor did he give Stephen Seidel any advice. Sending the waiver forms to his client Gamble in Arizona did not violate Disciplinary Rule 7-104, *supra* note 1, because he had made it clear, and both Gamble and Felix Seidel understood, that if the forms were to be used the parties signing them should first consult their own counsel; because the plan of obtaining waivers was abandoned within a few days after they were sent to Arizona for consideration; and because Felix and Stephen Seidel used the waiver prepared for Stephen's signature only several months later, after Stephen's Oregon counsel had taken a default against Felix contrary to Stephen's instructions and after Stephen had retained Arizona counsel. Murray maintains that this use of the form could no longer be construed as an indirect communication or advice from Murray to Stephen.

The trial board concluded that when Murray sent the waiver forms to Gamble, Murray "indirectly communicated" with Stephen Seidel because he intended and expected that the form would be made available to Stephen for his consideration with the aid of counsel, and that Murray had the duty of communicating with Stephen's Oregon counsel before doing this. The Disciplinary Review Board concurred with the trial board.

■ ■ We have no doubt that the disciplinary rule would have been violated if the suggested waiver had in fact

been taken up with Stephen Seidel before this tentative plan was abandoned. A verbal understanding between counsel and his own client that a third party should consult his own counsel is no substitute for the obligation to communicate directly with that party's counsel. Even when made in the best of faith, that understanding might or might not be heeded in later conversations between the laymen concerned, particularly members of the same family. Since Murray knew that Stewart represented Stephen in connection with the wage lien that Stephen might waive, he could not delegate to Gamble and Felix Seidel his obligation to communicate with Stewart before the plan to propose such a waiver actually went forward. The crux of this case is whether the plan did proceed far enough to constitute a violation of that obligation.

We conclude that it did not. It is true that sending the waiver forms to Gamble in Arizona along with the mortgage foreclosure complaint made it possible that an indirect communication with Stephen Seidel concerning his wage lien might have occurred through Gamble and Felix Seidel, but the fact is that it did not occur at that time.[3] The rule depends upon the occurrence of a direct or indirect communication with the third party; it is not violated by a failure to communicate with that party's lawyer when no such communication with the party himself ever takes place.

Even assuming that the effective enforcement of the underlying policy requires that the rule extend to attempted communications as well as actual ones, Murray's preparation of the waiver forms along with the complaint for Gamble did not rise to the level of an actual attempt on his part to communicate with or to advise Stephen Seidel. He maintained that he had no intention of proceeding with the Gambles' foreclosure

---

[3] We do not consider the later use of the form, after Stephen Seidel repudiated the actions of his Oregon counsel, as an improper indirect communication on Murray's part.

action on that basis without first assuring that any defendants from whom waivers might be obtained consulted their own attorneys in the matter, and he had made this clear to Gamble and Felix Seidel. Until a decision was reached to go forward with the tentative plan to seek such waivers, the time when Murray was obliged to consult with Stewart about submitting the proposal to Stephen had not yet come, and the plan was abandoned before the duty to do so arose. Although it may have been careless to risk a violation of the rule by initiating the possibility of an improper communication in Arizona under circumstances beyond Murray's control, the rule was not in fact violated.

The Bar's complaint is dismissed.